## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KAYLA MRAZ, individually and on behalf of all others similarly situated,<br><br>                          Plaintiff,<br><br>    v.<br><br>L'OREAL USA, INC.,<br><br>                       Defendant | Civil Action No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, Kayla Mraz ("Plaintiff"), individually, on behalf of herself, and on behalf of all others similarly situated, by and through her attorneys, brings this class action complaint against Defendant, L'Oreal USA, Inc. ("Defendant"), and alleges the following upon information and belief, except for those allegations pertaining to Plaintiff, which are based on personal knowledge:

### NATURE OF THE ACTION

1.      This is a class action lawsuit regarding Defendant's manufacturing, distribution, advertising, marketing, and sale of the La Roche-Posay branded benzoyl peroxide ("BPO") acne treatment products, Effaclar Duo Acne Spot Treatment (the "BPO Products") that contains dangerously high levels of benzene, a carcinogenic impurity that has been linked to leukemia and other cancers.

2.      The presence of benzene in the BPO Products renders them adulterated, misbranded, and illegal to sell under federal and state law.

3.      Prior to placing the BPO Products into the stream of commerce and into the hands of consumers to use on their skin, Defendant knew or should have known that the BPO Products contained benzene, but  misrepresented, omitted, and concealed this fact to consumers, including Plaintiff and Class members, by not including benzene on the BPO Products' labels or otherwise warning about its presence.

4.      Plaintiff and Class members reasonably relied on Defendant's representations that the BPO Products were safe, unadulterated, and free of any carcinogens that are not listed on the label.

5.      Plaintiff and Class members purchased the BPO Products, which contain harmful levels of benzene.

6.      The BPO Products are worthless because they contain benzene, a known human carcinogen that is an avoidable ingredient in the BPO Products' manufacturing process. Indeed, the presence of benzene renders the BPO Products adulterated, misbranded, and illegal to sell.

7.      Defendant is therefore liable to Plaintiff and Class members for misrepresenting and/or failing to disclose or warn that the BPO Products contain benzene or degrade and form benzene over a short period of time.

## PARTIES

### *Plaintiff*

8.      Plaintiff Mraz is a resident and citizen of Woodland Hills, California. Plaintiff Mraz has been purchasing and using Defendant's BPO Products over a period of approximately five years. Plaintiff Mraz has purchased BPO Products for personal or household use from several retailers in California, including CVS Pharmacy, Walgreens, and Target. She recently purchased Defendant's BPO Product in approximately July 2023.

9.      When purchasing the BPO Products, Plaintiff Mraz reviewed the accompanying labels and disclosures and understood them as representations by Defendant that the BPO Products were properly manufactured, free from defects, and safe for their intended use. Plaintiff Mraz relied on these representations when deciding to purchase the BPO Products, and these representations were part of the basis of the bargain. Had Defendant not made the false, misleading, and deceptive representations and omissions regarding the BPO Products containing benzene or that the BPO Products would degrade into benzene in a short period of time under reasonable conditions, Plaintiff Mraz would not have purchased the BPO Products. The BPO Products Plaintiff Mraz purchased were worthless because they contained the known carcinogen benzene.

Accordingly, Plaintiff Mraz was injured in fact and lost money as a result of Defendant's improper conduct.

### *Defendant*

10.     Defendant is a corporation organized, existing, and doing business under and by virtue of the laws of the state of Delaware with its principal place of business in New York, New York. Defendant markets, sells, and distributes the BPO Products at issue in California, New York, and throughout the United States. The BPO Products, including those purchased by Plaintiff and Class members, are available for sale on Defendant's website, www.laroche-posay.us, on www.amazon.com, and at retailer stores including Target, Ulta Beauty, CVS Pharmacy, Walgreens, Walmart, located throughout the United States. Defendant authorized the false, misleading, and deceptive marketing, advertising, distribution, and sale of the BPO Products.

## **JURISDICTION AND VENUE**

11.     This Court has subject-matter jurisdiction pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d) because (1) the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, (2) the action is a class action, (3) there are members of the Class who are diverse from Defendant, and (4) there are more than 100 Class members. This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367 because they form part of the same case or controversy as the claims within the Court's original jurisdiction.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant maintains its principal place of business in this District. In addition, a substantial part of the events or omissions giving rise to the claims asserted in this complaint occurred in this District.

## **FACTUAL ALLEGATIONS**

### I.    **Defendant's History in the Industry and the BPO Products**

13.     With respect to its La Roche-Posay line of products, Defendant represents that "[w]ith over 750+ studies and 25 years of extensive research, we are committed to developing safe

and effective products that are dermatologist developed and tested."[1]

14.    Further, Defendant states: "The formulation charter for each La Roche-Posay product goes far beyond international cosmetics regulations. We are strict because we care, and we embark on each step of our development process with precision and efficacy. Always backed by the ever-developing advancements in dermatological research."[2]

15.    Benzoyl peroxide is the active ingredient in the BPO Products manufactured, distributed, advertised, marketed, and sold by Defendant.

16.    Defendant advises consumers to use the BPO Products "1-3 times daily after cleansing skin thoroughly…on affected area."[3]

## II.    Evidence of Benzene's Danger

17.    Benzene is used primarily as a solvent in the chemical and pharmaceutical industries, as a starting material and intermediate in the synthesis of numerous chemicals, and in gasoline. The major United States source of benzene is petroleum. The health hazards of benzene have been recognized for over one hundred years.

18.    "Human exposure to benzene has been associated with a range of acute and long-term adverse health effects and diseases, including cancer and haematological effects."[4]

19.    A toxicity assessment by the Centers for Disease Control and Prevention has shown benzene can harm the central nervous system and may affect reproductive organs.[5]

20.    According to the World Health Organization, "Benzene is a genotoxic carcinogen in humans and no safe level of exposure can be recommended."[6]

---

[1] https://www.laroche-posay.us/our-story.html.

[2] *Id.*

[3] https://www.laroche-posay.us/our-products/face/acne-products/effaclar-duo-acne-spot-treatment-effaclarduoacnespottreatment.html (cleaned up).

[4] https://www.who.int/publications/i/item/WHO-CED-PHE-EPE-19.4.2.

[5] https://www.atsdr.cdc.gov/toxprofiles/tp3.pdf.

[6] WHO Guidelines for Indoor Air Quality: Selected Pollutants (2010).

21.     According to the National Cancer Institute, "[e]xposure to benzene increases the risk of developing leukemia and other blood disorders."[7]

22.     According to the National Toxicology Program, benzene is "known to be a human carcinogen based on sufficient evidence of carcinogenicity from studies in humans."[8]

23.     Benzene has also been "found to be carcinogenic to humans" by the International Agency for Research on Cancer ("IARC"). Benzene was "[f]irst evaluated by IARC in 1974 . . . and was found to be carcinogenic to humans (Group 1), a finding that has stood since that time."[9] As noted by the IARC:

> In the current evaluation, the Working Group again confirmed the carcinogenicity of benzene based on *sufficient evidence* of carcinogenicity in humans, *sufficient evidence* of carcinogenicity in experimental animals, and *strong* mechanistic evidence. … The Working Group affirmed the strong evidence that benzene is genotoxic, and found that it also exhibits many other key characteristics of carcinogens, including in exposed humans. In particular, benzene is metabolically activated to electrophilic metabolites; induces oxidative stress and associated oxidative damage to DNA; is genotoxic; alters DNA repair or causes genomic instability; is immunosuppressive; alters cell proliferation, cell death, or nutrient supply; and modulates receptor-mediated effects.[10]

24.     The U.S. Food and Drug Administration ("FDA") also recognizes that "[b]enzene is a carcinogen that can cause cancer in humans"[11] and classifies benzene as a "Class 1" solvent that should be "avoided" in drug manufacturing.[12] FDA guidance provides: "Solvents in Class 1 [e.g. benzene] should not be employed in the manufacture of drug substances, excipients, and drug

---

[7] https://www.cancer.gov/about-cancer/causes-prevention/risk/substances/benzene.

[8] http://ntp.niehs.nih.gov/go/roc/content/profiles/benzene.pdf (emphasis in original).

[9] Benzene / IARC Working Group on the Evaluation of Carcinogenic Risks to Humans (2017: Lyon, France), at p. 33.

[10] *Id*. at 34.

[11] https://www.fda.gov/food/chemicals/questions-and-answers-occurrence-benzene-soft-drinks-and-other-beverages#q1.

[12] https://www.fda.gov/media/71737/download.

products because of [its] unacceptable toxicity."[13]

25.    "Even in trace amounts, benzene is known to pose a health risk from exposure routes that include inhalation, ingestion, dermal absorption, and skin or eye contact."[14]

26.    In July 2021, the FDA conducted a "Health Hazard Evaluation" on "Multiple Aerosol Sunscreen Products" manufactured by Johnson & Johnson.[15] The evaluation was requested following testing which showed benzene levels ranging "from 11.2 to 23.6 ppm" in Johnson & Johnson's aerosol sunscreen products. Specifically, the agency requested "an evaluation of the likelihood and risks associated with using aerosol sunscreens that contain benzene 11.2 to 23.6 ppm," which "levels exceed the guideline value provided by ICH [Q3C][16] and USP[17]" limits, states the report. The FDA report concluded that serious adverse effects, including potential for "life-threatening" issues or "permanent impairment of a body function" were "likely to occur" at exposure levels within that range. In addition, the report stated that "individuals with altered skin absorption (i.e., infants, elderly, broken skin) and individuals who are exposed to benzene from other sources (e.g. smokers or occupational/environmental exposure) may be at greater risk."

27.    On December 27, 2023, in response to reports of benzene contamination in various drug products, the FDA issued an "Alert," advising manufacturers that "If any drug products batches with benzene above 2 ppm are already in distribution, the manufacturer should contact

---

[13] *Id.*

[14] Hudspeth, A., et al., Independent Sun Care Product Screening for Benzene Contamination, Environmental Health Perspectives, 130:3, Online Publication 29 March 2022.

[15] https://article.images.consumerreports.org/prod/content/dam/CRO-Images-2021/Health/12Dec/FDA_Benzene_in_Sunscreen_Assessment.

[16] The term "ICH" refers to The International Conference on Harmonization (ICH) Q3C Impurities: Residual Solvents guidance (December 1997), at https://www.fda.gov/media/71736/download?attachment.

[17] The term "USP" refers to United States Pharmacopeia (USP) Residual Solvents, at https://www.uspnf.com/sites/default/files/usp_pdf/EN/USPNF/generalChapter467Current.pdf.

FDA to discuss the voluntary initiation of a recall…."[18]

28.     Direct benzene exposure through the skin is particularly concerning, because "[d]irect exposure of the eyes, skin, or lungs to benzene can cause tissue injury and irritation."[19] Accordingly, The National Institute for Occupational Safety and Health ("NIOSH") recommends protective equipment be worn by workers exposed or expecting to be exposed to benzene at concentrations of 0.1 ppm and defines "inhalation, skin absorption, ingestion, skin and/or eye contact" as exposure routes or paths.[20]

29.     As with other topically applied products, such as sunscreen, the application of acne products specifically increases the absorption rate of benzene through the skin, thereby increasing the risk of harm.[21]

## III.    Discovery of Benzene in the BPO Products

30.     Due to the substantial harm to humans caused by exposure to chemicals such as benzene, companies have been founded with the specific goal of preventing defective products containing said harmful chemicals from reaching consumers. Valisure "is a pioneering technology company at the forefront of addressing a critical gap in the healthcare supply chain through independent quality assurance.[22] Its mission is "to help ensure the safety, quality, and consistency of medications and supplements in the market."[23]

---

[18] https://www.fda.gov/drugs/pharmaceutical-quality-resources/fda-alerts-drug-manufacturers-risk-benzene-contamination-certain-drugs.

[19] *Facts About Benzene,* CENTERS FOR DISEASE CONTROL AND PREVENTION, https://emergency.cdc.gov/agent/benzene/basics/facts.asp.

[20] *NIOSH Pocket Guide to Chemical Hazards - Benzene*, THE NATIONAL INSTITUTE FOR OCCUPATIONAL SAFETY AND HEALTH (NIOSH), https://www.cdc.gov/niosh/npg/npgd0049.html.

[21] *Valisure Detects Benzene in Sunscreen*, VALISURE BLOG (May 25, 2021), https://www.valisure.com/blog/valisure-news/valisure-detects-benzene-in-sunscreen/.

[22] https://www.valisure.com/about.

[23] *Valisure Citizen Petition on Benzene in Benzoyl Peroxide Drug Products* (March 5, 2024), chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://assets-global.website-files.com/6215052733f8bb8fea016220/65e8560962ed23f744902a7b_Valisure%20Citizen%20Pe

31.    In terms of accreditation and registration, "Valisure operates an analytical laboratory that is accredited under International Organization for Standardization ('ISO/IEC') 17025:2017 standards for chemical testing (PJLA Accreditation Number 94238)," and it "is registered with the Drug Enforcement Administration (License # RV0484814)."[24]

32.    Valisure has tested for specific chemical qualities in numerous types of products, such as N-Nitrosodimethylamine in ranitidine and metformin and benzene in hand sanitizers and sun care products. Each time, Valisure's detection of benzene and other carcinogens has been independently confirmed by the industry and led to recalls by manufacturers over the subject products.

33.    On March 5, 2024, Valisure reported its testing results for benzene in various types of BPO drug products, mostly utilizing gas chromatography and detection by mass spectrometry ("GC-MS") instrumentation that allows mass spectral separation and utilizing selected ion chromatograms, along with Selected Ion Flow Tube-Mass Spectrometry ("SIFT-MS") for detection of benzene released into the air around certain BPO products. Valisure also used other orthogonal approaches for confirmation of a few select products.[25]

34.    GC-MS "is generally considered one of the most accurate analyses available."[26] Indeed, the FDA used the same method to test for impurities like benzene in hand sanitizers.[27]

35.    "The GC-MS method described in [Valisure's] petition utilized body temperature (37°C) for oven incubation. 40°C has been previously used for benzene analysis from liquid pharmaceuticals and beverages, and reduced false positive results compared with higher-

---

tition%20on%20Benzene%20in%20Benzoyl%20Peroxide%20Drug%20Products.pdf ("*Valisure Citizen Petition*") at 5.

[24] *Id.*

[25] *Id.* at 10.

[26] *GC/MS Analysis*, Element, https://www.element.com/materials-testing-services/chemical-analysis-labs/gcms-analysis-laboratories.

[27] *Direct Injection Gas Chromatography Mass Spectrometry (GC-MS) Method for the Detection of Listed Impurities in Hand Sanitizers*, FDA (Aug. 24, 2020), https://www.fda.gov/media/141501/download.

temperature incubation."[28]

36.    Valisure analyzed 66 different BPO containing drug products incubated at 50°C[29] for 18 days, including Defendant's BPO Product, for the presence of benzene.[30]

37.    Defendant's BPO Product contained high levels of benzene, ranging from over 100 ppm after 10 days, approximately 175 ppm after 14 days, and 150 ppm after 18 days.[31]

38.    "The current data on BPO degrading into high levels of benzene is extremely concerning given its prominent use in skin care, and this study should serve as another wake-up call for improved manufacturing and quality control of consumer healthcare products."[32]

39.    The BPO Products are not designed to contain benzene, and no amount of benzene is acceptable in acne treatment products such as the BPO Products manufactured, distributed, and sold by Defendant. Further, although Defendant lists the ingredients on the BPO Products' labels, Defendant failed to disclose on the BPO Products' labeling or anywhere in Defendant's marketing that the BPO Product contains benzene.

40.    Despite its knowledge that the BPO Products contain benzene, Defendant has failed to issue a voluntary recall of the BPO Products.

## IV.    Benzene Renders the BPO Product Adulterated, Misbranded, and Illegal to Sell

41.    The BPO Products are "drugs" used to treat acne (i.e., *acne vulgaris*), formulated with a chemical called benzoyl peroxide, along with other inactive ingredients, to make acne treatment creams, washes, scrubs, and bars. Before being sold to the public, the BPO Products must be made in conformity with current good manufacturing practices and must conform to

---

[28] *Valisure Citizen Petition* at 10-11 (citations omitted).

[29] "50°C (122°F) is not only a reasonable temperature that 'the product may be exposed to during distribution and handling by consumers' but is an accepted incubation temperature used by the pharmaceutical industry for performing accelerated stability studies with a duration of at least 3 months." *Id.* at 18-19 (citations omitted).

[30] *Id.* at 15-16.

[31] *Id.* at 16.

[32] *Id.* at 29 (citing Email from Dr. Christopher Bunick, MD, PhD, Associate Professor of Dermatology at Yale University, New Haven, CT.).

quality, safety, and purity specifications.

42.     As drugs regulated by the FDA, the BPO Products are prohibited from being adulterated or misbranded.

43.     A drug is "adulterated" if it consists in whole or in part of any filthy, putrid, or decomposed substance, is impure, or mixed with another substance.[33]

44.     A drug is deemed misbranded if its labeling is false or misleading in any particular.[34]

45.     FDA guidance permits up to 2 ppm benzene in a product if its use in the manufacturing process is "unavoidable."[35]

46.     The FDA has announced recalls of various products contaminated with benzene, including certain hand sanitizers and sunscreens.[36]

47.     As set forth above, Defendant's BPO Products contain levels of benzene above 2 ppm.

48.     Defendant could have avoided any potential for benzene contamination in the BPO Products by changing the manufacturing process or raw ingredients, and the BPO Products could have been sold with absolutely no benzene in them. Specifically, BPO as a raw material is known to be thermally stable at purities as high as 75% up to temperatures of 98°C.[37] Valisure also evaluated pure BPO reference powder in its GC-MS analytical system and found no evidence of the instability and formation of benzene seen in formulated final products of BPO containing acne treatments.[38] Thus, if BPO is inherently stable as a pure, crystalline powder, a reformulated product

---

[33] *See* 21 U.S.C. § 351(a); *see also* § 351(b)-(d) (noting that a lack of purity or mixture with another substance also renders drug adulterated).

[34] *See* 21 U.S.C. § 352(a)(1).

[35] *Valisure Citizen Petition* at 6 (citing Food and Drug Administration, Q3C – *Tables and List Guidance for Industry* (2017) (https://www.fda.gov/media/71737/download)).

[36] *See Valisure Citizen Petition* at 7 (citations omitted).

[37] *Valisure Citizens Petition* at 25 (citation omitted).

[38] *Id.*

that focuses on substantially reducing or entirely preventing the degradation of BPO into benzene could potentially be developed.[39]

49.    The mere presence of benzene renders the BPO Products both adulterated and misbranded under the Federal Food, Drug, and Cosmetic Act ("FDCA").

50.    A product that is "adulterated" or "misbranded" cannot legally be manufactured, advertised, distributed, or sold.[40] Thus, adulterated and misbranded products like the BPO Products have no economic value and are legally worthless.

51.    Defendant's false, deceptive, and misleading label statements violate 21 U.S.C. § 331 and the so-called "little FDCA" statutes adopted by many states. California and New York have expressly adopted the federal drug labeling requirements as their own.[41] Thus, a violation of federal drug labeling laws is an independent violation of these state laws and actionable as such.

52.    Defendant's false, deceptive, and misleading label statements are unlawful under state unfair and deceptive acts and practices statutes and/or consumer protection acts, which prohibit unfair, deceptive, or unconscionable acts in the conduct of trade or commerce. The introduction of adulterated and misbranded drugs into interstate commerce is prohibited under the FDCA and all state parallel statutes cited in this Complaint.

53.    If Defendant had disclosed to Plaintiff and putative Class members that the BPO Products contained or would degrade into benzene, and thus risked benzene exposure during use of the BPO Products, Plaintiff and putative Class members would not have purchased the BPO Products.

54.    As manufacturers, distributors, and sellers of acne treatment products, Defendant had and has a duty to ensure that their BPO Products did not and do not contain excessive (or any)

---

[39] *See id.* at 25-26.

[40] *See* 21 U.S.C. § 331(a).

[41] *See, e.g.*, Cal. Health & Safety Code §§ 111250-111290 (adulterated drugs); Cal. Health & Safety Code §§ 111250-111290 (misbranded drugs); N.Y. Educ. Law § 6815 (adulterated and misbranded drugs).

level of benzene, including through regular testing, especially before injecting the BPO Products into the stream of commerce for consumers to use on their skin. But based on Valisure's testing results set forth above, Defendant made no reasonable effort to test its BPO Products for benzene. Nor did it disclose to Plaintiff in any advertising or marketing that its BPO Products contained or would degrade into benzene, let alone at levels that are many multiples of the emergency, interim limit set by the FDA. To the contrary, Defendant represented the BPO Products were of merchantable quality, complied with federal and state law, and did not contain carcinogens or other impurities such as benzene.

## V.    Defendant's Knowledge, Misrepresentations, Omissions, and Concealment of Material Facts Deceived Plaintiff and Reasonable Consumers

55.    It is well known that BPO degrades to benzene when exposed to heat over time. This process was first reported in scientific literature as early as 1936.[42]

56.    The issue of BPO decomposition into benzene has been previously identified and acted upon in industries other than in the acne treatment product industry.

57.    For example, at least one patent application was filed by the chemical company Akzo Nobel N.V. in 1997 which "relates to a method for reducing the rate of free benzene and/or benzene derivative formation in BPO formulations based on organic plasticizers, such as pastes, emulsions, suspensions, dispersions and the like."[43]

58.    In the polymer manufacturing industry, BPO's decomposition into benzene has been studied and concern was raised specifically regarding the carcinogenic implications of the presence of benzene. In 1994, a paper was published[44] by researchers at Denmark's Department

---

[42] H. Erlenmeyer and W. Schoenauer, *Über die thermische Zersetzung von Di-acyl-peroxyden,* HELU. CHIM. ACTA, 19, 338 (1936), https://onlinelibrary.wiley.com/doi/10.1002/hlca.19360190153.

[43] Borys F. SchafranBryce Milleville (1997). "Reduction of benzene formation in dibenzoyl peroxide formulations." Akzo Nobel N.V. Worldwide application, WO1997032845A1. (https://patents.google.com/patent/WO1997032845A1/en)

[44] Rastogi SC. Formation of benzene by hardeners containing benzoyl peroxide and phthalates. *Bull Environ Contam Toxicol*. 1994 Nov;53(5):747-52. doi: 10.1007/BF00196949. PMID: 7833612.

of Environmental Chemistry titled "Formation of benzene by hardeners containing benzoyl peroxide and phthalates" and stated:

> Recently, during the investigation of benzene residues in chemical products (Rastogi 1993a),[45] it was observed that the benzene content in benzoyl peroxide containing hardeners of two component repair-sets (fillers, elastomers) were >2 % (w/w) [20,000 ppm]. Benzene is carcinogenic (IARC 1982), and its use in consumer and industrial products is generally avoided.

59.    The study continues with heating of various BPO-containing products at 34°C, 50°C and 80°C finding substantial benzene formation at elevated temperatures, even exceeding levels found in this Petition. Furthermore, similar to Valisure's results, Rastogi finds that only formulations of BPO are unstable, while BPO alone is relatively stable:

> Even heating of BPO-phthalate mixtures at 50°C produced significant amounts of benzene (approximately 0.3% [3,000 ppm]), while no benzene production was detected when benzoyl peroxide was heated alone at this temperature (Table 2).[46]

60.    The referenced 1993 Rastogi article above, titled "Residues of Benzene in Chemical Products," has also been flagged by the US EPA as part of its Health & Environmental Research Online ("HERO") system.[47]

61.    Chemical evidence of carcinogenicity has been reported since at least 1981.[48] Multiple studies in the 1980s were conducted using animal models that suggested carcinogenic potential of benzoyl peroxide, including the use of commercial drug formulations of BPO like that

---

[45] Rastogi, S.C. Residues of benzene in chemical products. Bull. Environ. Contam. Toxicol. 50, 794-797 (1993). https://doi.org/10.1007/BF00209940.

[46] *Id.*

[47] US Environmental Protection Agency. Health & Environmental Research Online (HERO). "Residues of Benzene in Chemical Products." HERO ID 2894703 (http://hero.epa.gov/hero/index.cfm/reference/details/reference__id/2894703).

[48] Slaga TJ, Klein-Szanto AJ, Triplett LL, Yotti LP, Trosko KE. Skin tumor-promoting activity of benzoyl peroxide, a widely used free radical-generating compound. Science. 1981 Aug 28;213(4511):1023-5. doi: 10.1126/science.6791284. PMID: 6791284.

of PanOxyl Gel, another acne treatment product.[49]

62.    In 1991, FDA posted an amendment to the monograph for OTC topical acne drug products because, "the agency became aware of a 1981 study by Slage, et al. ([FDA] Ref. 1) that raised a safety concern regarding benzoyl peroxide as a tumor promoter in mice and a 1984 study by Kurokawa, et al. ([FDA] Ref. 2) that reported benzoyl peroxide to have tumor initiation potential," leading FDA to determine that "further study is necessary to adequately assess the tumorigenic potential of benzoyl peroxide."[50]

63.    By 2010, FDA published a final monograph on benzoyl peroxide along with summarizing results from further studies on the potential carcinogenicity of benzoyl peroxide and actions of the FDA Advisory Committee. This final monograph stated, "The Committee recommended, by a four-to-three vote (with one abstention), that the known safety data regarding the tumor promoting potential of benzoyl peroxide should be communicated to consumers. Because this data was inconclusive, the Committee unanimously agreed that the word, ''cancer'' should not be included in the labeling of acne drug products containing benzoyl peroxide. The Committee was concerned that the word ''cancer'' would cause consumers to avoid using these products (even though the data were inconclusive)."[51]

---

[49] Kurokawa Y, Takamura N, Matsushima Y, Imazawa T, Hayashi Y. *Studies on the promoting and complete carcinogenic activities of some oxidizing chemicals in skin carcinogenesis.* Cancer Lett. 1984 Oct;24(3):299-304. doi: 10.1016/0304-3835(84)90026-0. PMID: 6437666; Pelling JC, Fischer SM, Neades R, Strawhecker J, Schweickert L. *Elevated expression and point mutation of the Ha-ras proto-oncogene in mouse skin tumors promoted by benzoyl peroxide and other promoting agents.* Carcinogenesis. 1987 Oct;8(10):1481-4. doi: 10.1093/carcin/8.10.1481. PMID: 3115617; 81 O'Connell JF, Klein-Szanto AJ, DiGiovanni DM, Fries JW, Slaga TJ. *Enhanced malignant progression of mouse skin tumors by the free-radical generator benzoyl peroxide.* Cancer Res. 1986 Jun;46(6):2863-5. PMID: 3084079; 82 Iversen OH. *Carcinogenesis studies with benzoyl peroxide (Panoxyl gel 5%).* J Invest Dermatol. 1986 Apr;86(4):442-8. doi: 10.1111/1523-1747.ep12285787. PMID: 3091706.

[50] Food and Drug Administration. *Proposed Rule: Reclassifies benzoyl peroxide from GRASE to Category III.* (August 7, 1991) Federal Register, 56FR37622. pp 37622 - 37635 (https://cdn.loc.gov/service/ll/fedreg/fr056/fr056152/fr056152.pdf#page=178).

[51] Food and Drug Administration. Final Monograph. (March 4, 2010) Federal Register, 75FR9767. (https://www.gpo.gov/fdsys/pkg/FR-2010-03-04/pdf/FR-2010-4424.pdf).

64.     In 2020, the FDA started working with companies to identify benzene in products, which resulted in product recalls of hand sanitizers, sunscreens, and deodorants. In 2021, an independent chemical analysis by Valisure of hundreds of sunscreens and after-sun care products from 69 brands found 27 percent of the batches had significant levels of benzene above the FDA 2 ppm limit.[52]

65.     By 2021, Defendant was well aware of benzene contamination issues in its BPO Products and in products of its competitors.

66.     Further, Defendant, which markets itself as a merchandiser of quality acne treatment products and employed high-level scientists, chemists, and researchers to formulate and/or decide which drug products to label and sell for public use, was aware of the well-known chemical processes that degrade their BPO Products into benzene when exposed to common used temperatures and conditions.

67.     *All* of Defendant's BPO Products are manufactured in the same manner.

68.     *All* lots of Defendant's BPO Products systematically degrade and form benzene over a short period of time.

69.     The rates of degradation and benzene impurities in the BPO products occur at a predictable and systematic rate, typically reaching their highest benzene concentration within 10 to 18 days.

70.     Defendant, a large, sophisticated corporation in the business of manufacturing, distributing, and selling products containing BPO, knew or should have known the BPO Products were contaminated with excess levels of benzene and that testing the BPO Products for benzene was necessary to protect Plaintiff and putative class members from harmful levels of benzene exposure.

71.     Defendant's use of BPO put it on notice of the excessive levels of benzene in the BPO Products.

---

[52] Valisure Citizen Petition on Benzene in Sunscreen and After-sun Care Products, May 24, 2021.

72.    Notwithstanding this knowledge, Defendant failed to appropriately and adequately test its BPO Products for the presence of benzene to protect Plaintiff and Class members from dangerous levels of benzene exposure.

73.    Defendant sold, and continues to sell, BPO Products during the class period despite Defendant's knowledge of the risk of benzene contamination.

74.    Benzene is not listed on the BPO Products' labels as an ingredient, nor is there any warning about the inclusion (or even potential inclusion) of benzene in the BPO Products.

75.    Defendant has engaged in deceptive, untrue, and misleading advertising by making representations by failing to warn about the potential presence of benzene in the BPO Products, and nothing on the BPO Products' labels otherwise insinuate, state, or warn that the BPO Products contain or will degrade into benzene.

76.    The presence of benzene in the BPO Products renders the BPO Products misbranded and adulterated and therefore illegal and unfit for sale in trade or commerce. Plaintiff would not have purchased the BPO Products had they been truthfully and accurately labeled.

77.    Had Defendant adequately tested its BPO Products for benzene and other carcinogens and impurities, it would have discovered its BPO Products contained benzene – even at levels above the FDA's limit (to the extent even applicable), making the BPO Products illegal to distribute, market, and sell.

78.    Defendant also knew or should have known about the carcinogenic potential of benzene because it is classified as a Group 1 compound by the World Health Organization and the International Agency for Research on Cancer, meaning that it is "carcinogenic to humans."[53]

79.    Accordingly, Defendant knowingly, recklessly, or at least negligently, introduced a contaminated, adulterated, and misbranded BPO Products containing or that would degrade into dangerous amounts of benzene into the U.S. market.

80.    By marketing and selling its BPO Products in the stream of commerce with the

---

[53] https://monographs.iarc.who.int/list-of-classifications.

intent that its BPO Products would be purchased by Plaintiff and Class members, Defendant warrants that the BPO Products are safe to use rather than adulterated acne treatment products containing a dangerous, cancer-causing chemical.

81.    Defendant did not disclose the actual or potential presence of benzene in its BPO Products on the BPO Products' labeling, advertising, marketing, or sale of the BPO Products.

82.    Defendant's concealment was material and intentional because people are concerned with what is in the products that they are putting onto and into their bodies. Consumers such as Plaintiff and Class members make purchasing decisions based on the representations made on the BPO Products' labeling, including the ingredients listed.

83.    Defendant knows that if it had not omitted that the BPO Products contained or would degrade into benzene, then Plaintiff and Class members would not have purchased the BPO Products.

## VI.    Injuries to Plaintiff and Class Members

84.    When Plaintiff purchased Defendant's BPO Products, Plaintiff did not know, and had no reason to know, that Defendant's BPO Products contained or would degrade into the harmful carcinogen benzene. Not only would Plaintiff not have purchased Defendant's BPO Products had she known the Products contained or would degrade into benzene, but she would also not have been capable of purchasing them if Defendant had done as the law required and tested the BPO Products for benzene and other carcinogens and impurities.

85.    Consumers lack the ability to test or independently ascertain or verify whether a product contains unsafe substances, such as benzene, especially at the point of sale, and therefore must rely on Defendant to truthfully and honestly report what the BPO Products contain on the BPO Products' packaging or labels.

86.    Further, given Defendant's position as a leader in the pharmaceutical, health, and beauty market, Plaintiff and reasonable consumers trusted and relied on Defendant's representations and omissions regarding the presence of benzene in the BPO Products.

87.    Yet, when consumers look at the BPO Products' packaging, there is no mention of

benzene. It is not listed in the ingredients section, nor is there any warning about the inclusion (or even potential inclusion) of benzene in the BPO Products. This leads reasonable consumers to believe the BPO Products do not contain benzene. Indeed, these expectations are reasonable because if the BPO Products are manufactured and tested properly, benzene will not be present in the Products.

88.     No reasonable consumer would have paid any amount for products that contain or will degrade into benzene, a known carcinogen and reproductive toxin, much less above the limits set by the FDA.

89.     Thus, if Plaintiff and Class members had been informed that Defendant's BPO Products contained or would degrade into benzene, they would not have purchased or used the BPO Products, making such omitted facts material to them.

90.     Defendant's false, misleading, omissions, and deceptive misrepresentations regarding the presence of benzene in the BPO Products are likely to continue to deceive and mislead reasonable consumers and the public, as it has already deceived and misled Plaintiff and the Class members.

91.     Plaintiff and Class members bargained for products free of contaminants and dangerous substances. Plaintiff and Class members were injured by the full purchase price of the BPO Products because the BPO Products are worthless, as they are adulterated and contain harmful levels of benzene and Defendant failed to warn consumers of this fact. Such illegally sold products are worthless and have no value.

92.     As alleged above, Plaintiff and Class members' BPO Products contained benzene.

93.     Plaintiff and Class members are further entitled to statutory and punitive damages, attorneys' fees and costs, and any further relief this Court deems just and proper.

94.     All conditions precedent to the prosecution of this action have occurred, and/or have been performed, excused, or otherwise waived.

## **CLASS ALLEGATIONS**

95.     Plaintiff individually and on behalf of all others similarly situated, brings this class

action pursuant to Fed. R. Civ. P. 23.

96.    Plaintiff seeks to represent a class defined as:

All persons who purchased the BPO Products in the United States for personal or household use within any applicable limitations period ("Nationwide Class").

97.    In the alternative, Plaintiff seeks to represent a subclass defined as:

All persons who purchased the BPO Products in California for personal or household use within any applicable limitations period ("California Subclass").

98.    Plaintiff also seeks to represent a subclass defined as:

All persons who purchased one or more of Defendant's BPO Products in the States of California, Florida, Illinois, Massachusetts, Michigan, Minnesota, Missouri, New Jersey, New York, or Washington for personal or household use within any applicable limitations period ("Consumer Fraud Multi-State Subclass").[54]

99.    Excluded from the Class and Subclasses are: (1) any Judge or Magistrate presiding over this action and any members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entities in which Defendant or its parents and any entities in which Defendant has a controlling interest and its current or former employees, officers, and directors; and (3) individuals who allege personal bodily injury resulting from the use of the BPO Products.

100.    Plaintiff reserves the right to modify, change, or expand the definitions of the Class based upon discovery and further investigation.

101.    *Numerosity*: The Class is so numerous that joinder of all members is impracticable.

---

[54] While discovery may alter the following, the states in the Consumer Fraud Multi-State Subclass are limited to those states with similar consumer fraud laws under the facts of this case: California (Cal. Bus. & Prof. Code § 17200, *et seq.*); Florida (Fla. Stat. § 501.201, *et seq.*); Illinois (815 Ill. Comp. Stat. 505/1, *et seq.*); Massachusetts (Mass. Gen. Laws Ch. 93A, *et seq.*); Michigan (Mich. Comp. Laws § 445.901, *et seq.*); Minnesota (Minn. Stat. § 325F.67, *et seq.*); Missouri (Mo. Rev. Stat. § 407.010, *et seq.*); New Jersey (N.J. Stat. § 56:8-1, *et seq.*); New York (N.Y. Gen. Bus. Law §§ 349 and 350); and Washington (Wash. Rev. Code § 19.86.010, *et seq.*).

The Class likely contains thousands of members based on publicly available data. The Class is ascertainable by records in Defendant's possession.

102.    *Commonality*: Questions of law or fact common to the Class include, without limitation:

a.    Whether the BPO Products contain benzene;

b.    Whether a reasonable consumer would consider the presence of benzene in the BPO Products to be material;

c.    Whether Defendant knew or should have known that the BPO Products contain benzene;

d.    Whether Defendant misrepresented the BPO Products contain or will degrade into benzene;

e.    Whether Defendant failed to disclose that the BPO Products contain or will degrade into benzene;

f.    Whether Defendant concealed that the BPO Products contain or will degrade into benzene;

g.    Whether Defendant engaged in unfair or deceptive trade practices;

h.    Whether Defendant violated the state statutes alleged herein;

i.    Whether Defendant was unjustly enriched;

j.    Whether Defendant acted negligently; and

k.    Whether Plaintiff and Class members are entitled to damages.

103.    *Typicality*: Plaintiff's claims are typical of the claims of Class members. Plaintiff and Class members were injured and suffered damages in substantially the same manner, have the same claims against relating to the same course of conduct, and are entitled to relief under the

same legal theories.

104.    *Adequacy*: Plaintiff will fairly and adequately protect the interests of the Class and has no interests antagonistic to those of the Class. Plaintiff has retained counsel experienced in the prosecution of complex class actions, including actions with issues, claims, and defenses similar to the present case. Counsel intends to vigorously prosecute this action.

105.    *Predominance and superiority*: Questions of law or fact common to Class members predominate over any questions affecting individual members. A class action is superior to other available methods for the fair and efficient adjudication of this case because individual joinder of all Class members is impracticable and the amount at issue for each Class member would not justify the cost of litigating individual claims. Should individual Class members be required to bring separate actions, this Court would be confronted with a multiplicity of lawsuits burdening the court system while also creating the risk of inconsistent rulings and contradictory judgments. In contrast to proceeding on a case-by-case basis, in which inconsistent results will magnify the delay and expense to all parties and the court system, this class action presents far fewer management difficulties while providing unitary adjudication, economies of scale and comprehensive supervision by a single court. Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

106.    Accordingly, this class action may be maintained pursuant to Fed. R. Civ. P. 23(b)(3).

## CAUSES OF ACTION

### COUNT I
**VIOLATION OF STATE CONSUMER FRAUD ACTS**
**(On behalf of Plaintiff and the Consumer Fraud Multi-State Subclass)**

107.    Plaintiff re-alleges and incorporates by reference all preceding factual allegations as though set forth fully herein.

108.    Plaintiff brings this Count on behalf of herself and the Consumer Fraud Multi-State Subclass against Defendant.

109.    The Consumer Fraud Acts of the states in the Consumer Fraud Multi-State Subclass prohibit the use of unfair or deceptive business practices in the conduct of trade or commerce.

110.    Plaintiff and the other members of the Consumer Fraud Multi-State Subclass have standing to pursue a cause of action for violation of the Consumer Fraud Acts of the states in the Consumer Fraud Multi-State Subclass because Plaintiff and members of the Consumer Fraud Multi-State Subclass have suffered an injury in fact and lost money as a result of Defendant's actions set forth herein.

111.    Defendant engaged in unfair and/or deceptive conduct by making material misrepresentations and omissions regarding the presence of benzene in the BPO Products, as discussed herein.

112.    Defendant intended that Plaintiff and each of the other members of the Consumer Fraud Multi-State Subclass would rely upon its unfair and deceptive conduct and a reasonable person would in fact be misled by this deceptive conduct described above.

113.    Given Defendant's position in the acne treatment market as an industry leader, Plaintiff and reasonable consumers trusted and relied on Defendant's representations and omissions regarding the presence of benzene in the BPO Products.

114.    As a result of Defendant's use or employment of unfair or deceptive acts or business practices, Plaintiff and each of the other members of the Consumer Fraud Multi-State Subclass have sustained damages in an amount to be proven at trial.

115.    In addition, Defendant's conduct showed malice, motive, and the reckless disregard of the truth such that an award of punitive damages is appropriate.

## COUNT II
**VIOLATION OF CALIFORNIA'S FALSE ADVERTISING LAW, BUSINESS & PROFESSIONS CODE SECTION 17500 ("FAL")**
**(On behalf of Plaintiff and the California Subclass)**

116.    Plaintiff re-alleges and incorporates by reference all preceding factual allegations as though set forth fully herein.

117.    Plaintiff brings this cause of action on behalf of herself and the California Subclass members against Defendant.

118.    The FAL provides that "[i]t is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services" to disseminate any statement "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

119.    It is also unlawful under the FAL to disseminate statements concerning property or services that are "untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." *Id.*

120.    As alleged herein, the advertisements, labeling, policies, acts, and practices of Defendant relating to the BPO Products misled consumers acting reasonably as to the presence of benzene in the BPO Products or the risk thereof.

121.    At the time of its misrepresentations, Defendant was either aware that the BPO Products contained or would degrade into benzene or was aware that it lacked the information and/or knowledge required to truthfully represent that the BPO Products would not expose Plaintiff and consumers to benzene exposure. Defendant concealed and omitted and failed to disclose this

information to Plaintiff and Class members.

122.    Defendant's descriptions of the BPO Products were false, misleading, and likely to deceive Plaintiff and other reasonable consumers.

123.    Plaintiff suffered injury in fact as a result of Defendant's actions as set forth herein because they purchased the BPO Products in reliance on Defendant's false and misleading labeling claims and omissions that the BPO Products, among other things, are safe for use on their skin.

124.    Had Defendant disclosed the true nature of the BPO Products, and the fact that it contains a chemical that is a known carcinogen associated with serious health consequences, Plaintiff and California Subclass members would not have purchased the BPO Products.

125.    Defendant's business practices as alleged herein constitute deceptive, untrue, and misleading advertising pursuant to the FAL because Defendant has advertised the BPO Products in a manner that is untrue and misleading, which Defendant knew or reasonably should have known, and omitted material information from its advertising.

126.    Defendant profited from its sale of the falsely and deceptively advertised BPO Products to unsuspecting consumers.

127.    As a result, Plaintiff, California Subclass members, and the general public are entitled to injunctive and equitable relief, restitution, and an order for the disgorgement of the funds by which Defendant was unjustly enriched. Plaintiff seeks such equitable relief, in the alternatively, should her legal remedies prove unavailable.

128.    Pursuant to Cal. Bus. & Prof. Code § 17535, Plaintiff, on behalf of herself and California Subclass members, seeks an order enjoining Defendant from continuing to engage in deceptive business practices, false advertising, and any other act prohibited by law, including those set forth in this Complaint. Injunctive relief is needed, as Defendant continues to misrepresent the

true nature of the Products and continues to mislead the public. Additionally, Plaintiff has purchased the BPO Products, and would be willing to purchase these BPO Products again, if the risk of benzene exposure was eliminated.

## COUNT III
### FOR VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW, BUSINESS & PROFESSIONS CODE SECTION 17200 et seq. ("UCL")
### (On behalf of Plaintiff and the California Subclass)

129.    Plaintiff re-alleges and incorporates by reference all preceding factual allegations as though set forth fully herein.

130.    Plaintiff brings this cause of action on behalf of herself and California Subclass members against Defendant.

131.    The UCL prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.

132.    The acts, omissions, misrepresentations, practices, and non-disclosures of Defendant as alleged herein constitute business acts and practices.

133.    The acts alleged herein are "unlawful" under the UCL in that they violate at least the following laws:

a.    The False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 et seq.;

b.    The Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 et seq.;

c.    The Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301 et seq.; and

d.    The California Sherman Food, Drug, and Cosmetic Law, Cal. Health & Safety Code §§ 110100 et seq.

134.    Defendant's conduct with respect to the labeling, advertising, and sale of the BPO Products was "unfair" because Defendant's conduct was immoral, unethical, unscrupulous, or substantially injurious to consumers and the utility of their conduct, if any, does not outweigh the gravity of the harm to their victims.

135.    Defendant's conduct with respect to the labeling, advertising, and sale of the BPO Products was and is also unfair because it violates public policy as declared by specific

constitutional, statutory or regulatory provisions, including but not limited to the applicable sections of: the Consumers Legal Remedies Act, the False Advertising Law, the Federal Food, Drug, and Cosmetic Act, and the California Sherman Food, Drug, and Cosmetic Law.

136.    Further, the consumer injury was substantial, not outweighed by benefits to consumers or competition, and not one consumer themselves could reasonably have avoided.

137.    A statement or practice is "fraudulent" under the UCL if it is likely to mislead or deceive the public, applying an objective reasonable consumer test.

138.    As set forth herein, Defendant's claims relating the representations and omissions stated on the BPO Products' labeling and marketing statements mislead reasonable consumers regarding the presence of benzene in the BPO Products.

139.    Defendant profited from its sale of the falsely, deceptively, and unlawfully advertised the BPO Products to unsuspecting consumers.

140.    Plaintiff and California Subclass members are likely to continue to be damaged by Defendant's deceptive trade practices, because Defendant continues to disseminate misleading information on the BPO Products' packaging. Additionally, Plaintiff has purchased the BPO Products, and would be willing to purchase these Products again, if the exposure to benzene was eliminated. Thus, injunctive relief enjoining Defendant's deceptive practices is proper.

141.    Defendant's conduct caused and continues to cause substantial injury to Plaintiff and the other California Subclass members. Plaintiff has suffered injury in fact as a result of Defendant's unlawful conduct, including economic injury.

142.    In accordance with Bus. & Prof. Code § 17203, Plaintiff seeks an order enjoining Defendant from continuing to conduct business through unlawful, unfair, and/or fraudulent acts and practices, and to commence a corrective advertising campaign.

143.    Plaintiff and the Class also seek an order for and restitution of all monies from the sale of the Products, which were unjustly acquired through acts of unlawful competition. Plaintiff seeks such equitable relief, in the alternatively, should their legal remedies prove unavailable.

**COUNT IV**
**VIOLATION OF CALIFORNIA'S CONSUMER LEGAL REMEDIES ACT, CIVIL**
**CODE SECTION 1770 ("CLRA")**
**(On behalf of Plaintiff and the California Subclass)**

144.    Plaintiff re-alleges and incorporates by reference all preceding factual allegations as though set forth fully herein.

145.    Plaintiff brings this cause of action on behalf of herself and California Subclass members against Defendant.

146.    The CLRA prohibits deceptive practices in connection with the conduct of a business that provides goods, property, or services primarily for personal, family, or household purposes.

147.    Defendant's false and misleading labeling, omission of material facts, and other policies, acts, and practices were designed to, and did, induce the purchase and use of the Products for personal, family, or household purposes by Plaintiff and Class members, and violated and continue to violate the following sections of the CLRA:

    a.    § 1770(a)(5): representing that goods have characteristics, uses, or benefits which they do not have;

    b.    § 1770(a)(7): representing that goods are of a particular standard, quality, or grade if they are of another;

    c.    § 1770(a)(9): advertising goods with intent not to sell them as advertised; and

    d.    § 1770(a)(16): representing the subject of a transaction has been supplied in accordance with a previous representation when it has not.

148.    Plaintiff and Class members relied on Defendant's misrepresentations and omissions in deciding to purchase Defendant's BPO Products.

149.    Defendant's misrepresentations and omissions were an immediate cause of and substantial factor in Plaintiff and Class members' decision to purchase Defendant's BPO Products. Had the presence of benzene in Defendant's BPO Products been disclosed, Plaintiff and Class

members would have been aware of the attendant safety risks and would not have purchased or paid as much for Defendant's BPO Products.

150.    Defendant profited from the sale of the falsely, deceptively, and unlawfully advertised BPO Products to unsuspecting consumers.

151.    Defendant's wrongful business practices constituted, and constitute, a continuing course of conduct in violation of the CLRA.

152.    Pursuant to the provisions of Cal. Civ. Code § 1782(a), Plaintiff provided written notice to Defendant on March 15, 2024 via certified mail through the United States Postal Service demanding corrective action pursuant to the CLRA. If Defendant does not thereafter correct its business practices, Plaintiff will amend (or seek leave to amend) the complaint to add claims for monetary relief, including restitution and actual damages under the CLRA.

153.    Pursuant to California Civil Code § 1780, Plaintiff seeks injunctive relief, reasonable attorney fees and costs, and any other relief that the Court deems proper.

<u>**COUNT V**</u>
**NEGLIGENT MISREPRESENTATION/OMISSION**
**(On behalf of Plaintiff and the Class)**

154.    Plaintiff repeats and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

155.    Plaintiff brings this cause of action on behalf of herself and the Class against Defendant.

156.    This claim is brought under the laws of the state of New York.

157.    Through its labeling and advertising, Defendant made representations to Plaintiff and the Class members concerning the content of its BPO Products.

158.    Defendant has a duty to provide accurate information to consumers with respect to the contents of its BPO Products as detailed above.

159.    Defendant failed to fulfill its duty to accurately disclose, through its labeling, advertising or otherwise, that its BPO Products contain or will degrade into benzene.

160.    Additionally, Defendant has a duty to not make false representations with respect to its BPO Products.

161.    Defendant failed to fulfill this duty when it made false representations regarding the quality and safety of the BPO Products as detailed above.

162.    Such failures to disclose on the part of Defendant amount to negligent omission and the representations regarding the quality and safety of the BPO Products amount to negligent misrepresentation.

163.    Defendant's conduct constitutes fraud in the inducement in that it occurred in connection with misrepresentations, statements, or omissions that caused Plaintiff and putative Class members to enter into a transaction (i.e., to purchase Defendant's BPO Products). As such, Defendant's fraudulent activities occurred independent of the contract to purchase.

164.    Plaintiff and the other members of the Class reasonably relied upon such representations and omissions to their detriment.

165.    By reason thereof, Plaintiff and the other Class members have suffered damages in an amount to be proven at trial.

<u>**COUNT VI**</u>
**UNJUST ENRICHMENT**
**(On behalf of Plaintiff and the Class)**

166.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

167.    Plaintiff brings this cause of action on behalf of herself and the Class against Defendant.

168.    This claim is brought under the laws of the state of New York.

169.    Defendant's conduct violated, *inter alia*, state and federal law by manufacturing, advertising, marketing, and selling the BPO Products while misrepresenting and omitting material facts.

170.    Defendant's unlawful conduct allowed Defendant to knowingly realize substantial revenues from selling the BPO Products at the expense of, and to the detriment or impoverishment of Plaintiff and Class members and to Defendant's benefit and enrichment. Defendant has thereby violated fundamental principles of justice, equity, and good conscience.

171.    Plaintiff and Class members conferred significant financial benefits and paid substantial compensation to Defendant for the BPO Products, which was not as Defendant represented them to be.

172.    Defendant knowingly received and enjoyed the benefits conferred on them by Plaintiff and Class members.

173.    It is inequitable for Defendant to retain the benefits conferred by Plaintiff and Class members' overpayments.

174.    Plaintiff and Class members seek establishment of a constructive trust from which Plaintiff and Class members may seek restitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, pray for relief and judgment against Defendant as follows:

A.    Certifying the Class pursuant to Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiff as representatives of the Class and Subclasses, and designating Plaintiff' counsel as Class Counsel;

B.    Awarding Plaintiff and Class members compensatory damages, in an amount to be determined at trial;

C.    Awarding Plaintiff and Class members appropriate relief, including but not limited to actual damages;

D.    For restitution and disgorgement of profits;

E.      Awarding Plaintiff and Class members reasonable attorneys' fees and costs as allowable by law;

F.      Awarding pre-judgment and post-judgment interest;

G.      For punitive damages; and

H.      Granting any other relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury of all claims so triable.

Dated: March 15, 2024                          Respectfully submitted,

*/s/ Seven Sukert*
Steven Sukert (Bar # 5690532)
Jeff Ostrow
Kristen Lake Cardoso
**KOPELOWITZ OSTROW, P.A.**
One West Las Olas Blvd., Suite 500
Fort Lauderdale, FL 33301
Telephone: (954) 525-4100
sukert@kolawyers.com
cardoso@kolawyers.com
ostrow@kolawyers.com

James E. Cecchi
Jason H. Alperstein
Donald E. Ecklund
Kevin Cooper
**CARELLA, BYRNE, CECCHI,**
**OLSTEIN, BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744
jcecchi@carellabyrne.com
jalperstein@carelleabyrne.com
decklund@carellabyrne.com
kcooper@carellabyrne.com

*Attorneys for Plaintiff and the Putative*
*Classes*